UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ARTHUR SARGENT, ET AL.                    CIVIL ACTION

VERSUS                                    NO: 08-3887

UNITED STATES OF AMERICA, ET              SECTION: "J"(5)
AL.


**ORDER AND REASONS**

A number of homeowners have brought motions seeking a preliminary injunction to prevent the United States Army Corps of Engineers ("USACE") from coming onto their property and removing fences, trees, and other obstructions that the USACE considers to be threats to the flood protection levee along the east side of the 17th Street Canal in the City of New Orleans.  The Orleans Levee District ("OLD"), which owns the levee and granted rights of access to the USACE, has intervened.


**PROCEDURAL HISTORY AND BACKGROUND FACTS**

This case was filed on July 8, 2008 by two property owners, the Sargents and Byrams, to prevent the USACE from

removing fences, trees, and other structures and vegetation from their properties that the USACE deemed to be within the toe of the 17th Street Canal levee.  These property owners initially requested a temporary restraining order, alleging that the destruction or removal of their property was imminent.  During a hearing before this Court on July 10, the parties and the government agreed to hold off on any action on these properties until a hearing on plaintiffs' motion for preliminary injunction could be held on July 30.  On July 18, three additional property owners, the Caplans, Hennessys, and Feinmans, filed a motion to intervene in the case.  The motion to intervene was granted on July 24.  Subsequently, the Caplans filed for a temporary restraining order.  After a brief telephone hearing, the Court on July 25 issued an order preserving the status quo until the motion for preliminary injunction could be heard.   The properties owned by all of these parties are located along the Orleans or east side of the 17th Street Canal on Bellaire Drive, generally in the southern segment of the canal levee system between the railroad tracks and I-10.

        Prior to the filing of this action, a similar action was filed in the Civil District Court for the Parish of Orleans. That case was filed by several individual Bellaire Drive homeowners and a coalition of homeowners affected by the USACE plan to remove fences and trees. Plaintiffs in the state court

2

not only sought injunctive relief, but also sought to certify a class representing all affected homeowners along Bellaire Drive. On July 6, immediate injunctive relief was denied, however the state court case is still proceeding on claims for money damages. No class has been certified as of this date.

## THE PARTIES' ARGUMENTS

The basic argument of plaintiffs and intervenor-plaintiffs is that the actions of the USACE to remove trees and fences without due process is unconstitutional because the USACE cannot present evidence that a servitude exists on the subject properties.  Alternatively, the intervenor-plaintiffs assert that regardless of the state law servitude issue, the USACE is required to hold a predeprivation of property due process hearing before a taking of property.

Specific to the motions before the Court, plaintiffs and intervenor-plaintiffs argue that they can fulfill the four-part test for issuance of an injunction.  First, they assert that they can prevail on the merits because, whether using the Louisiana Civil Code Article 665 and Louisiana Revised Statute § 38:225 (theoretical toe plus six feet) theory or the *St. Julien* doctrine theory, the government cannot establish that they have a servitude of use over the subject properties.  Second, they argue that removal of trees is irreparable harm because of the amount

3

of time it would take for trees to regrow.  Third, they argue
that the government will not be harmed in any manner by an
injunction while plaintiffs will lose part of their backyards.
Fourth, they argue that because of the recent addition of gates
to the mouth of the 17th Street Canal there is no threat of
flooding during a hurricane and thus an injunction would not be a
disservice to the public interest.

The government argues that plaintiffs and intervenor-
plaintiffs have not proven the elements necessary for the
granting of an injunction.  First, the government has retracted
its argument proffered at the first hearing in this matter that
the property the USACE seeks to enter does not belong to
plaintiffs and is actually public property owned by the OLD.  The
government now concedes that the property they seek to enter does
in fact belong to plaintiffs and intervenor-plaintiffs.
Nonetheless, the government argues that plaintiffs and
intervenor-plaintiffs do not satisfy the four-part test for
granting an injunction.

As to the first part of the injunction test, likelihood
of success on the merits, the government makes several arguments.
First, they assert that the subject properties are burdened by a
servitude of use in favor of OLD that allows OLD to grant the
USACE a right to enter the properties and conduct necessary levee
maintenance.  Second, the government argues that because the

servitude developed under the *St. Julien* doctrine, it cannot be extinguished or prescribed by non-use.  Third, the government believes that any claims for a taking are jurisdictionally barred.

As to the second part of the injunction analysis, the government argues that any injuries plaintiffs and intervenor-plaintiffs might suffer can be compensated with money damages at a later time, and thus there is no irreparable harm.  For the third part of the test, the government asserts that the balance of harms favors denying the injunction because the government would incur significant delays and costs if the project does not move forward, whereas the plaintiffs and intervenor-plaintiffs would have little hardship since they have had some time to challenge the removal project and can still seek money damages. Lastly, as to part four, the government argues that the public interest favors denial of the injunction request because it would prevent or delay completion of an important flood protection project, the necessity of which is clear in light of the catastrophic flooding in the City of New Orleans caused by levee failures during hurricane Katrina.

## DISCUSSION

The Fifth Circuit has established a four-part test for the issuance of a preliminary injunction.  The four parts of this test are: "(1) a substantial likelihood that plaintiff will

prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." <u>Canal Auth. of Fla. v. Callaway</u>, 489 F.2d 567, 572 (5th Cir. 1974).  The party seeking a preliminary injunction, in this case the plaintiffs and intervenor-plaintiffs, have the burden of persuasion. <u>Miss. Power & Light Co. v. United Gas Pipe Line Co.</u>, 760 F.2d 618, 621 (5th Cir. 1985).  To prevail, the movers must clearly carry the burden of persuasion on all four parts of the <u>Callaway</u> test.  <u>Id.</u>  The Fifth Circuit has continuously emphasized that "a preliminary injunction is 'an extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." <u>Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara</u>, 335 F.3d 357, 363 (5th Cir. 2003)(<u>citing</u> <u>Miss. Power</u>, 760 F.2d at 621).


<u>Likelihood of Success on the Merits</u>

     To evaluate the likelihood of plaintiffs' and intervenor-plaintiffs' success on the merits, the court must look to the standards provided by the applicable substantive law. <u>Miss. Power</u>, 760 F.2d at 622.  Plaintiffs' and intervenor-

6

plaintiffs' substantive argument in this case is that no servitude burdens their property which permits the USACE or OLD to come upon their property and remove trees, fences, and other obstructions for levee maintenance purposes.  The government first argued that OLD was granted a servitude over portions of the subject properties pursuant to Louisiana Civil Code Article 665 and Louisiana Revised Statute § 38:225.  Article 665 of the Louisiana Civil Code provides that servitudes are imposed for "the making and repairing of levees."  Louisiana Revised Statute § 38:225 prohibits placing any obstruction within six feet of any part of a levee which "obstructs or interferes with the safety of the levee or is an obstacle to the inspection, construction, maintenance or repair of any levee."  The government has argued that these two state provisions, taken together, create a servitude in favor of OLD extending six feet from the toe of the levee.  However, plaintiffs and intervenor-plaintiffs contend that because the provisions of Louisiana Civil Code Article 665 apply only to riparian lands bordering navigable rivers, and the 17th Street Canal is not a navigable river, no servitude exists.

This same theory was argued by the parties to the state court action seeking injunction of tree and fence removal.  In his denial of a temporary restraining order, Judge Kern Reese of the Civil District Court for the Parish of Orleans stated that he "overwhelmingly agrees" with state court plaintiffs' argument

7

that the 17th Street Canal is not a navigable waterway, but reserved judgment on the overall theory, to be "addressed as the litigation progresses further."  Reasons for Judgment, 17th Street Canal Coalition, et al. v. Orleans Levee District, et al., NO. 08-06979 (July 6, 2008).

Alternatively, the government has asserted that a servitude exists based on the *St. Julien* doctrine.  The *St. Julien* doctrine grew out of an 1883 Louisiana Supreme Court case, St. Julien v. Morgan Louisiana and Texas Railroad Co., 35 La. Ann. 924 (La. 1883).  The doctrine was codified in 1976 in Louisiana Revised Statute § 19:14 after the case law creating the doctrine was prospectively overruled by the Louisiana Supreme Court in Lake, Inc. v. Louisiana Power & Light Co., 330 So. 2d 914 (La. 1976).   Three elements are necessary to establish a servitude under the *St. Julien* doctrine: 1) a public or quasi-public body with powers of expropriation must be involved; 2) landowners must give consent or acquiescence; and 3) a facility in the public interest must be constructed.  Cancienne v. Lafourche Parish Police Jury, 423 So. 2d 662, 670 (La. Ct. App. 1982).  For the second element, the only consent required is the acquiescence of the owner of the property at the time the servitude is established.  Rogers v. Louisiana Power & Light Co., 391 So. 2d 30, 34 (La. Ct. App. 1980). Subsequent property owners take the property subject to the servitude.  Id.

The government contends that all of these elements are met.  First, the government argues that OLD is properly considered a public body with powers of expropriation under Louisiana Revised Statute § 19:2(1).  Second, the government contends that there is no evidence that landowners along Bellaire Drive objected to a servitude of use at the time the levee was constructed in 1948.  Lastly, the government argues that there can be no dispute that this levee is for the public interest.

Plaintiffs and intervenor-plaintiffs argue that the *St. Julien* doctrine is not applicable because the actual levee does not extend into any of their properties.  Plaintiffs and intervenor-plaintiffs have produced surveys of several of the properties involved that show a lack of any identification of a levee on the properties.  Specifically, some surveys do not indicate that the toe of the levee is on the properties.  Plaintiffs and intervenor-plaintiffs further assert that although the government has produced various surveys, some from as long ago as 1948, that identify the toe of the levee as being within several of the properties, these surveys have no probative value because the government does not provide a legal definition of "levee" or "toe".  There is no legal definition for a levee "toe" in Louisiana law.

Plaintiffs and intervenor-plaintiffs have consistently argued that neither Louisiana Civil Code Article 665 and

Louisiana Revised Statute § 38:225 combined, nor the *St. Julien* doctrine create a servitude for OLD because the government misplaces the location of the levee toe.  While the government contends that the actual toe is within the properties at issue, plaintiffs and intervenor-plaintiffs assert that because the 17th Street Canal levee is overbuilt or fattened, the toe of the levee, for purposes of structural integrity, is actually much closer to the canal waters.

The dispute over the location of the actual levee toe has developed in connection with the tree and fence removal project.  In an effort to appease property owners along the canal, the USACE created a theoretical levee section that included a theoretical toe.  This theoretical toe was established to ascertain a location for the levee toe that provides for the structural integrity of the levee, satisfying USACE guidelines, while intruding as little as possible into the properties of homeowners along the levee.  As those guidelines have changed over recent years, the location of the theoretical toe has been altered.  Each adjustment has moved the theoretical toe closer to the canal.  USACE is using this theoretical toe to determine the trees, fences, and other obstructions that must be removed from plaintiffs' and intervenor-plaintiffs' properties.  Thus, the creation of the theoretical toe, and each subsequent change to that toe has been to the benefit of the plaintiffs and

intervenor-plaintiffs.

Plaintiffs and intervenor-plaintiffs have submitted a post-hearing Declaration by an expert who disagrees with the extent of the theoretical toe as determined by the USACE.  As regards the ongoing dispute as to the location of the actual levee toe and the location of the theoretical levee toe it appears that plaintiffs and intervenor-plaintiffs wish for this Court to determine the correct location of both toes.

Plaintiffs and intervenor-plaintiffs also argue that even if a servitude once existed over their properties, the doctrine of equitable estoppel applies to prevent the government from exercising rights to the servitude today.  In Louisiana, equitable estoppel can apply against the state.  Dep't of Culture, Recreation & Tourism v. Fort Macomb Dev. Corp., 385 So. 2d 1233, 1236 (La. Ct. App. 1980).  However, the Louisiana Constitution prohibits prescription from running against the state in any civil matter.  LA. CONST. of 1974, art. 12, § 13. Further, the Louisiana Constitution specifically prevents the lands of a levee district from being lost by prescription.  LA. CONST. of 1974, art. 9, § 4.  As a result, prescription by non-use will not extinguish servitudes held by the state as a public person.  4 LOUISIANA CIVIL LAW TREATISE § 225.

Plaintiffs and intervenor-plaintiffs contend that because the government allowed them to build on and maintain the

parts of the levee that are on their property, the government must now be estopped from claiming a servitude on these parts of the properties.  Plaintiffs and intervenor-plaintiffs specifically argue that the government's failure to stop them from maintaining and improving the properties was a representation that plaintiffs and intervenor-plaintiffs relied on, and that such reliance will be to their detriment if the government can now destroy those improvements.  The government submits that a *St. Julien* servitude in favor of OLD cannot be prescribed by non-use. The government points to the provisions of the Louisiana Constitution that prohibit prescription from running against the state and that prohibit a levee district from losing land by prescription to support their assertion that no servitude has or could have been lost.  See LA. CONST. of 1974, arts. 12, § 13 and 9, § 4.  Lastly, the government asserts that because they have continuously maintained the parts of the levee outside plaintiffs' and intervenor plaintiffs' fence line, including coming upon the levee to cut grass and conduct maintenance, estoppel does not apply.

        The government separately argues that the plaintiffs and intervenor-plaintiffs have no chance of success on the merits because their claims are jurisdictionally barred.  While maintaining their claim that a servitude exists, the government argues that even if plaintiffs and intervenor-plaintiffs can

prove that there is no servitude then at most the government's tree and fence removal program would amount to a trespass.  There is a two-part test to determine whether a government action is an unconstitutional taking or a tort-based trespass.  The Court of Federal Claims explained this two-part analysis in Ridge Line, Inc. v. United States, 346 F.3d 1346 (Fed. Cir. 2003).  First, a taking occurs when "the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" Id. at 1355-56 (citations omitted).  Second,"the nature and magnitude of the government action must be considered.  Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Id.

The government argues that in this case the USACE only intends to execute a task on a servitude and that the removal of trees and fences is an incidental or consequential injury.  Second, the government argues that they do not intend to permanently occupy the land such that this action would be considered a taking.  The USACE intends to come upon the subject

13

properties for less than a day and will not impair plaintiffs'
and intervenor-plaintiffs' enjoyment of the property for any
greater period of time.  Third, all the benefits of the USACE
action will accrue to the homeowners in the area as a result of
greater levee protection.  Thus, the government asserts that this
action is improperly before this Court.  In addition, the
government submits that if this case is in fact a Fifth Amendment
takings claim against the United States then it should be brought
in the Court of Federal Claims.  See 28 U.S.C. § 1491(a)(1)
(2008).  Alternatively, if this is a tort claim against the
United States, then it is governed by the Federal Tort Claims Act
and administrative remedies must be exhausted.  See 28 U.S.C. §
2675(a).

Plaintiffs and intervenor-plaintiffs, as well as the
government, have submitted numerous arguments to the Court to
support their contentions regarding the likelihood of success on
the merits.  Ultimately, success for plaintiffs and intervenor-
plaintiffs on the merits is a question of state property law and
a determination of whether a servitude exists over the subject
properties to permit entry by the government to remove trees,
fences, and other obstructions.  The government's argument for a
servitude pursuant to Louisiana Civil Code Article 665 and
Louisiana Revised Statute § 38:225 contains flaws that may defeat
the existence of a servitude, as was acknowledged by the state

14

court in the parallel proceeding.  However, the government does state a stronger case for a servitude under the *St. Julien* doctrine.  If a servitude is found, then the type of servitude would guide any estoppel or prescription analysis.  Further, much of plaintiffs' and intervenor-plaintiffs' argument is an assault on the alleged location of the toe and theoretical toe of the levee as determined by the government.  Plaintiffs and intervenor-plaintiffs would have this Court make a determination that the precise location of the toe and theoretical toe is different from the location asserted by USACE and OLD's own experts and engineers.  Such a finding would be unlikely.  Given all of the arguments proffered by the parties it is clear to the Court that while plaintiffs and intervenor-plaintiffs may be able to make certain colorable arguments that no servitude exists to permit entry for the tree and fence removal project, plaintiffs and intervenor-plaintiffs have not "clearly" demonstrated that they are likely to succeed in a later action on the merits. Plaintiffs and intervenor-plaintiffs have not carried their burden as to part one of the <u>Callaway</u> injunction test.[1]

---

[1]The Court does not address arguments made in the United States and USACE memoranda that they are owed indemnity from OLD and that plaintiffs and intervenor-plaintiffs cannot state a valid action for compensation under the *St. Julien* doctrine because these arguments are irrelevant to the preliminary injunction analysis.

Threat of Irreparable Harm

Plaintiffs and intervenor-plaintiffs argue that the taking of trees, fences, and other vegetation or structures constitutes irreparable harm.  In the Fifth Circuit, an irreparable injury is one that cannot be undone by a monetary remedy.  Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecutoriana, 762 F.2d 464, 472-73 (5th Cir. 1985)(citing Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981)).  Plaintiffs and intervenor-plaintiffs identified and cited in their memoranda several Louisiana cases where the taking of trees constituted irreparable harm.  In De La Croix v. Villere, 11 La. Ann. 39 (La. 1856), the Louisiana Supreme Court held that an injunction was proper to prevent the irreparable harm of cutting trees on a plaintiff's plantation when a large volume of trees were to be cut and the trees might be necessary to plaintiff for housing repairs.  In Deer Slayers, Inc. v. Louisiana Motel and Investment Co., 434 So. 2d 1183 (La. App. 1 Cir. 1983), a hunting club was successful in seeking an injunction to prevent the lessor of land that the club used for hunting from cutting down hundreds of acres of trees on that land.  The Louisiana First Circuit, in holding an injunction was the appropriate remedy, emphasized the amount of time that would be required for the trees to regrow.  Id. at 1188.

The government argues that there is no irreparable

16

injury because plaintiffs' and intervenor-plaintiffs' injury can be compensated by money damages at a later date.  The most that any plaintiff or intervenor-plaintiff will lose in their backyard is their rear fence and any trees or shrubs along that rear fence line.  One plaintiff stands only to lose their rear fence and one tree.  The government asserts that whether plaintiffs and intervenor-plaintiffs argue that the USACE actions are an unconstitutional taking or a tort of trespass, money damages can be sought for compensation.  Also of note, the judge in the parallel state court action specifically held that any potential unconstitutional taking along the 17th Street Canal might be compensated with money damages at a later date, and there is currently pending a state court action for money damages.

It is difficult for the Court to identify any irreparable harm to the homeowners in this case.  The evidence at the hearing on the motion for preliminary injunction shows that all of the plaintiffs and intervenor-plaintiffs sustained substantial flooding during hurricane Katrina as a direct consequence of the failure of the levee system at the northern end of the 17th Street Canal.  As a result of this experience, as well as flooding caused by other levee failures around the City, the USACE undertook to rebuild and stabilize the levees in New Orleans.  In accordance with that project, the Corps determined that it was necessary and prudent to require the removal of trees

17

and other obstructions that were either on the levees or close enough to the levees to cause potential instability or damage to the integrity of the levees, or that needed to be removed to allow proper maintenance.  As discussed above, the USACE is utilizing a theoretical toe to determine the trees, fences, and other obstructions that must be removed to ensure the stability of the levee and to allow for proper maintenance.  As a result of using this theoretical toe instead of the actual levee toe, the USACE plans to remove a limited number of trees and vegetation, mostly those falling right along or immediately within the rear line of the subject properties.[2]  For example, Mr. Sargent testified that the current USACE plan would require removal of a single hackberry tree from his property.   Mrs. Byram testified that the current plan would remove a line of mostly small "sticks" (trees) that run along her rear fence line.  Only three or four of the trees are somewhat larger.  One intervenor-plaintiff will lose a row of ligustrums along the rear fence line, and yet another will lose a row of Oleanders.   While plaintiffs and intervenor-plaintiffs understandably place great personal value on their trees and the privacy they provide, the

---

[2]For the most part, plaintiffs' and intervenor-plaintiffs' properties are approximately 200 feet deep along Bellaire Drive. The tree removal program apparently will extend no further than a few feet into any of the rear yards.   There is no evidence that any structures other than rear fences will have to be removed. The plaintiffs will be permitted to move their rear fences to provide desired security.

Court is not persuaded that this rises to the level of irreparable harm warranting the issuance of a preliminary injunction.  Any injury to these plaintiffs and intervenor-plaintiffs can be compensated with money damages at a later time.

### Injury to Plaintiff Outweighs Injury to Defendant

This part of the injunction test is essentially a balancing of the equities between the opposing parties.  DSC Commc'ns Corp. v. DGI Techs., Inc., 81 F.3d 597, 600 (5th Cir. 1996).  Plaintiffs and intervenor-plaintiffs argue that there is no harm to the government from being forced to wait for a final determination of the property rights at issue.  At the same time, they assert that the loss of mature vegetation and structures is a far greater loss to plaintiffs and intervenor-plaintiffs. Conversely, the government argues that if the Court stops the tree and fence removal project they would be forced to seek immediate appellate review, which would incur costs.  Also, the government argues that any delay would lead to greater costs for the USACE and its contractor, who would be able to invoke penalties in their contract with the government.

It is obvious that plaintiffs and intervenor-plaintiffs will be harmed if no injunction is granted, and conversely that the government will be harmed if an injunction is granted.  In the Court's opinion the harm to either party is not substantial.

19

As noted above, plaintiffs and intervenor-plaintiffs only stand
to lose their rear fences and vegetation extending only a few
feet into their properties if no injunction is ordered.  The
government most certainly will be forced to pay greater costs if
an injunction is ordered, however given the limited scope of the
tree and fence removal project compared to the government's
resources, such harm would not be great.  Neither side of this
dispute can make a particularly strong argument for or against an
injunction based on the equities.


                        Public Interest

        Both the United States Supreme Court and the Fifth
Circuit have stressed the importance of this factor in the
injunction analysis.  The Supreme Court has stated that "courts
of equity should pay particular regard for the public
consequences in employing the extraordinary remedy of
injunction."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312
(1982) (citing R.R. Comm'n v. Pullman Co., 312 U.S. 496, 500
(1941)).  In Mississippi Power, the Fifth Circuit emphasized the
increasing importance of weighing the public interest, beyond the
interests of the named litigants, when considering an injunction.
760 F.2d at 618.

        Plaintiffs and intervenor-plaintiffs argue that an
injunction is not against the public interest because the

                              20

government has waited several years after hurricane Katrina to complete this project, an indication that it is not of pressing importance.  Also, plaintiffs and intervenor-plaintiffs assert that the addition of gates to the mouth of the 17th Street Canal that enable the USACE to prevent the flow of water from Lake Ponchartrain into the canal during severe weather, render it no longer a part of the hurricane protection system in the New Orleans area.  As a result, plaintiffs and intervernor-plaintiffs argue that the canal no longer poses a threat of flooding the city during a hurricane, and catastrophic failures of the levee, such as happened during hurricane Katrina are no longer possible.

The government counters that the tree and fence removal project was undertaken precisely because of the threat trees, fences, and other obstructions on or near the levee pose to the public safety.  Although there are gates at the mouth of the canal that will be closed in the event of severe weather, the levee remains an essential element of the protection system for the City of New Orleans.  During a hurricane or other severe weather, rain water from other parts of the city will be pumped into the 17th Street Canal which could cause the water in the canal to rise beyond the structurally safe level.  The government also states that failure to remove these obstructions could lead the 17th Street Canal levee to fail federal inspection causing the levees to be decertified, adversely impacting the federal

21

flood insurance program and flood insurance rates for homeowners
in New Orleans.

It is clear to this Court that the public interest
weighs heavily in favor of denying plaintiffs' and intervenor-
plaintiffs' request for an injunction.  In the wake of hurricane
Katrina and the devastation it wrought on the City of New
Orleans, there can be no greater public interest for this City
than flood protection.  Although the addition of gates to the
mouth of the 17th Street Canal may minimize the impact of storm
surge in the canal, the levee walls are still an important
element of flood protection for New Orleans.  Ultimately, the
USACE has determined that this project is necessary for the
stability of the levees.  There can be little doubt that
proceeding with the project is in the public interest.


### Intervenor-Plaintiffs' Alternative Argument

The intervenor-plaintiffs have filed additional
memoranda arguing that regardless of a determination of the
existence of a state law servitude, the government must conduct a
due process hearing before taking their property.  McCulloch v.
Glasgow, 620 F.2d 47 (5th Cir. 1980).  In McCulloch, a
Mississippi town built a public road over a strip of land that
certain plaintiffs claimed as their unencumbered property.  Id.
at 50.  The plaintiffs had objected to the road but the town went

22

ahead with construction.  Id.  After completion of the road, the
plaintiffs asserted a federal civil rights claim for compensation
for the taking of property without due process.  Id. at 49.  A
jury awarded compensation to plaintiffs.  Id.  On appeal, the
Fifth Circuit held that the town had violated the plaintiffs' due
process rights by depriving them of a significant property
interest without the benefit of a hearing to determine the
disputed property rights and thus an award of damages was proper.
Id. at 50.  Intervenor-plaintiffs in the current case argue that
they are in the same position as the McCulloch plaintiffs,
holding an unencumbered significant property interest that the
government is threatening to take without a due process hearing.

        The government has not specifically replied to this
argument.  However, as part of their response to the original
plaintiffs, the government argued that the USACE's actions are
not a taking in the constitutional sense.  Unlike in McCulloch,
there is a clear dispute in the present case as to whether the
tree and fence removal project even constitutes a taking, let
alone a taking that requires a due process hearing prior to tree
and fence removal.  In McCulloch the town took and kept the
property at issue.  Here, the government asserts that plaintiffs
and intervenor-plaintiffs will have full use of their property,
simply without some trees and the current fence lines.  Also, the
USACE has held numerous public meetings to discuss the planned

tree and fence removal project and to allow affected citizens to lodge complaints.  The creation of the theoretical toe was itself the product of the government's response to homeowner protests. According to testimony at the preliminary injunction hearing, the USACE has spoken to individual homeowners along Bellaire Drive to minimize the impact of the tree and fence removal program. Plaintiffs and intervenor-plaintiffs have known of the plan to remove trees and fences from their properties yet have not pressed for any judicial hearing of their grievances until the final hour.

In addition, unlike the present case, there was no issue of public safety to consider in McCulloch.  The town involved took land for the purpose of building a road, not to protect a city from catastrophic flooding.  Since the current case is before the Court on consideration of a preliminary injunction, it is essential to take account of the public interest.  See Weinberger, 456 U.S. at 312 (1982) (citing R.R. Comm'n v. Pullman Co., 312 U.S. 496, 500(1941)).  The public interest, as discussed above, clearly favors denial of an injunction for the purposes of holding a due process hearing in this case.

**CONCLUSION**

In conclusion, the Court finds that based on the four-part injunction test, plaintiffs and intervenor-plaintiffs definitely fail two parts.  There is no irreparable harm that plaintiffs and intervenor-plaintiffs can prove and issuing an injunction is most certainly against the public interest.  In addition, the Court is not persuaded of the likelihood that plaintiffs and intervenor-plaintiffs will succeed on the merits.  However, even if they were to succeed in a later trial, money damages are adequate to compensate them for the loss of trees and fences. Accordingly,

Plaintiffs' and intervenor-plaintiffs' motions for preliminary injunction are **DENIED.**

New Orleans, Louisiana, this 5th day of August, 2008.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE